UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 04/16/2024
```

PATRICIA BUNTEN, REGINALD BROWN,
TAMIE HOLLINS, LISA ROSS, MAURICE
WILLIAMS, and MARITZA WILSON,

                              Plaintiffs,

        -against-

JOSEPH DONAT, GEORGE GARRISON,
WILLIAM HORTON, and CITY OF NEWBURGH,

                              Defendants.

No. 21-CV-04588 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Plaintiffs Patricia Bunten, Reginald Brown, Tamie Hollins, Lisa Ross, Maurice Williams, and Maritza Wilson (collectively, "Plaintiffs") commenced this action via Complaint against Defendants Joseph Donat, George Garrison,[1] and the City of Newburgh (the "City") (collectively, "Defendants") on May 21, 2021 ("Compl.," ECF No. 1). Plaintiffs assert claims of discrimination on the basis of race, gender, and national origin under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.

Before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 seeking to dismiss Plaintiffs' claims in their entirety. For the following reasons, the Court grants in part and denies in part Defendants' motion.

---

[1] In their Opposition, Plaintiffs voluntarily dismissed with prejudice any claims asserted against Defendant George Garrison. (Pl. Opp. at 1.)

## BACKGROUND

The following facts are derived from the record, the parties' Rule 56.1 statements, and the parties' declarations and affidavits.[2]  They are not in dispute unless otherwise noted.

### a.  Defendants

Joseph Donat served as City Manager for the City of Newburgh (the "City") from December 2018 until May 2021. (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1.) The parties dispute whether Donat, as City Manager, drafted, developed or set employment policies for the City. (Donat Aff. ¶ 3; Ross Aff. ¶ 5.) George Garrison served as Superintendent of Public Works from 2002 through 2009. (Def. 56. 1 ¶ 4.) In or around July or August 2019, Garrison started to help with oversight of the Code Compliance Department. (Garrison Tr. 13:11-14:4; Horton Tr. 78:11-22; Bunten Tr. 27:14-17.)

Chief William Horton served as the City's Fire Chief from January 2020 through December 2020, when he retired. (Def. 56.1 ¶ 8.) Chief Horton also served as the City Building Inspector from April 2017 through December 2020. (*Id.* ¶ 9.) Chief Horton had an office located at 123 Grand Street in Newburgh. (*Id.* ¶ 10; Pl. 56.1 Resp. ¶ 10.)

### b.  Patricia Bunten

Patricia Bunten, a Hispanic woman, has been employed by the City as a Bilingual Account Clerk in the Code Compliance Department (the "Department") since December 14, 2008. (Def. 56.1 ¶ 13; Compl. ¶ 8.) She was one of three clerks assigned to the Department, which is located at 123 Grand

---

[2]  The parties fully briefed the present motion as of June 20, 2023: Defendants' Motion for Summary Judgment (ECF No. 46); Defendants' Memorandum of Law in Support ("Def. Mem.," ECF No. 52); Defendants' Local Rule 56.1 Statement of Material Facts ("Def. 56.1," ECF No. 47); Defendants' Reply Memorandum ("Def. Reply," ECF No. 61); Plaintiffs' Opposition ("Pl. Opp." ECF No. 53); Plaintiffs' Response and Counterstatement to Defendants' Rule 56.1 Statement of ("Pl. 56.1 Resp." or "Pl. 56.1 Counter," ECF No. 54). Plaintiffs also submitted multiple affidavits, which are cited to as "[LAST NAME] Aff." (*See* ECF Nos. 49-51, 55-60.)

Citations to "Def. Ex." refer to the Exhibits attached to the Declaration of Lauren Schnitzer in Support of Defendants' Motion for Summary Judgment. (ECF No. 48.) Citations to "Pl. Ex." refer to the Exhibits attached to the Affirmation of Michael H. Sussman in Opposition. (ECF No. 62.)

Where applicable, the Court uses Bates number of the documents as provided by the parties.

Street in Newburgh. (Def. 56.1 ¶¶ 14, 15.) Bunten's job functions included office work, answering phones, receiving building permit applications, filing and reconciliation of money received in-person or through mail from individuals applying for building permits, and meeting people at the Department window. (*Id.* ¶¶ 16-17.)

In March 2020, the City temporarily shut down some of its departments because of the COVID-19 pandemic. (*Id.* ¶ 20.) By memorandum dated March 17, 2020, Donat advised the City's Department Heads that all City Buildings would be closed to the general public due to the City's State of Emergency. (*Id.* ¶ 21.) The memorandum provided that "essential employees" were expected to report to work as they would under normal circumstance and "non-essential employees/departments" were expected to reduce workforce and provide staff with the option to work from home to the extent practicable. (*Id.* ¶ 22.) The Office of Code Compliance, along with other departments and employees including the Planning and Development Department, was designated as "non-essential." (*Id.* ¶¶ 23-25.)

In March 2020, the City offered and Bunten accepted a 15-day paid emergency leave of absence to care for her children who were on remote instruction because of pandemic-related school closures. (*Id.* ¶¶ 28-29.) On or about April 15, 2020, Bunten called Garrison and asked to work from home after her 15-day leave of absence expired so that she could care for and proctor her children who were still on remote instruction. (*Id.* ¶ 30.) Garrison advised Bunten that the decision was up to Chief Horton. (*Id.* ¶ 31.) Later that day, Bunten asked Chief Horton whether she could work remotely, and Chief Horton advised her to speak with Michelle Kelson, the City's Corporation Counsel. (*Id.* ¶ 32.) On April 16, 2020, Bunten emailed Chief Horton requesting to work from home. (*Id.* ¶ 33.)

By memorandum dated April 17, 2020, the City's Human Resources Administrator Stan Merritt ("HRA Merritt") advised all City employees that the Code Enforcement function had been designated essential, effective Monday, April 20, 2020. (*Id.* ¶ 34.) Bunten's request to work remotely was denied. Chief Horton advised Bunten that she could instead take a leave of absence pursuant to the Family and

Medical Leave Act ("FMLA"). (*Id.* ¶ 43.) Bunten applied for and was granted leave of absence pursuant to the Emergency Family Medical Leave Expansion Act ("EFMLEA") from April 20, 2020 through June 26, 2020, which required her to use ten days of her accrued time and receive two-thirds of her salary. (*Id.* ¶ 44; Bunten Tr. 45:22-46:7.) Ultimately, Bunten took nine weeks of EFMLEA leave and returned to work in-person on June 27, 2020. (*Id.* ¶ 45.) In September 2020, Donat granted Bunten's request to take her remaining three weeks of EFMLEA leave for the period effective September 16, 2020 through approximately October 7, 2020. (*Id.* ¶ 48.)

Plaintiffs allege that Buntan's request to work from home was denied because she is Hispanic. Despite the designation of the Department as essential, Plaintiffs assert that given the reduced workload for all three clerks and the office's ability to readjust functions, Bunten could have performed all her critical job functions at home. (Pl. 56.1 Resp. ¶¶ 39, 42.) Specifically, Plaintiffs allege that "the business flow was markedly reduced" and the two other clerks "were more than capable of managing the traffic." (*Id.*¶ 35.) Defendants allege that the decision not to permit Bunten to work remotely was not decided on an individual basis or based on her national origin. (Def. 56.1 ¶¶ 39-40.)  Rather the decision was due to the Department being designated essential, which required all employees in that department to appear for work in-person. (*Id.*)

### c.  Reginald Brown

Reginald Brown, who identifies as a Black and Hispanic man, was hired by the City as a Code Enforcement Officer within the City's Code Compliance Department (the "Department") in January 2017. (Def. 56.1 ¶¶ 73, 49.) At the time of his hiring, Brown's supervisor was Steve Hunter. (*Id.* ¶ 52.)

The City posted advertisements for the position of Code Compliance Supervisor. (*Id.* ¶ 53 (citing Def. Ex. R).) To qualify for the Code Compliance Supervisor position, an applicant had to have either (1) a bachelor's or associate's degree in engineering, architecture, fire protection, construction management or closely related field; or (2) at least four years of experience as a building inspector or

code enforcement officer or at least six years of management experience in the design, construction or supervision of the construction of buildings. (*See* Def. Ex. R.)

In July 2020, Brown applied for the position. (Def. 56.1 ¶ 54.) Other employees within the Department also applied for the Code Compliance Supervisor position, including Quanetta Inman and Lisa Ross. (*Id.* ¶ 57.) Inman, described as "African American" by Bunten, was interviewed for the position but she was ultimately not appointed due to an issue related to code violations for certain City properties. (*Id.* ¶¶ 58, 60-61.) Neither Inman, Ross, or Brown were hired for the position. The City continued to review applications for the position, which Garrison reviewed and then provided feedback on the applicants to Chief Horton. (*Id.* ¶¶ 62-63.) After applying for the position, Jason Beeman was appointed and served as Code Compliance Supervisor from January 2021 until November 2021. (*Id.* ¶¶ 64-65.)

Plaintiffs dispute that Beeman was qualified for the position, while Defendants dispute that Brown met the minimum qualifications. At the time of his application, Brown had an associate's degree in the Arts and had three years of experience as a code compliance officer. (Def. Ex. S.) At the time of his application, Beeman did not have a bachelor's or associate's degree, but had several years of experience as a project manager and estimator, as well as a jobsite foreman. (Def. Ex. U.)

### d. Tamie Hollins

Tamie Hollins, an African American woman, was appointed to the provisional position of Code Compliance Officer within the City's Code Compliance Department (the "Department") effective March 27, 2017. (Def. 56.1 ¶ 78; Compl. ¶ 40.) At that time, her supervisor was Steve Hunter, who held the position of Code Compliance Supervisor. (Def. 56.1 ¶ 81.)  Hollins' goal in her position was to "find housing or resources for individuals or families who[se] properties were condemned by [the] [C]ode [C]ompliance [D]epartment." (*Id.*  ¶¶ 78-79; Pl. 56.1 Resp. ¶¶ 78-79; Hollins Tr. 34:2-6.) Hollins passed

the Civil Service Exam and received a permanent appointment to the position of Code Compliance Officer effective January 3, 2018. (Def. 56.1 ¶ 80.)

During the relevant period, the Department was located at 123 Grand Street in Newburgh. (*Id.* ¶ 86; Pl. Resp. 56.1 ¶ 86.) Since at least 2017, City employees assigned to offices at 123 Grand Street included individuals from a variety of racial and ethnic backgrounds. (Def. 56.1 ¶ 89.) Several areas within 123 Grand Street, including the Department and the City's Department of Planning and Development, both of which are located on the first floor, have experienced high temperatures in the summer and cold temperatures in the winter during those times when the air conditioning or heat was malfunctioning. (*Id.* ¶ 88.) Since at least 2017, employees from various departments and of various racial and ethnic backgrounds have frequently received municipal vehicles that required maintenance for air conditioning, heat tires, or other issues. (*Id.* ¶¶ 90-91.)

Despite conceding that there were issues throughout the building, Plaintiffs allege that the extreme conditions Hollins was subjected to and complained about was not common to the entire building, including mold infestation on her wall which imperiled her breathing. (Pl. Resp. 56.1 ¶ 89.) Moreover, while City employees from various departments have received municipal vehicles with maintenance issues, Plaintiffs argue minority workers in the Code Compliance Department have always been assigned subpar vehicles while employees from other departments received a mix of newer vehicles. (*Id.* ¶ 91.) Plaintiffs further argue that personal protective equipment, including face masks and sanitizer was distributed to White employees over African American or Hispanic employees. (*Id.* ¶¶ 100-101.)

   *e.   Lisa Ross*

Lisa Ross, an African American woman, began working in the City's Code Compliance Department (the "Department") in February 2015. (Def. 56.1 ¶¶ 102-103; Pl. 56.1 Resp. ¶¶ 102-103; Compl. ¶ 52.) On or about October 9, 2019, Ross applied for the position of Code Compliance

Supervisor. (Def. 56.1 ¶ 106.) On October 9, 2020, HRA Merritt advised Ross via letter that she did not meet the minimum qualifications for the Code Compliance Supervisor position. (*Id.* ¶ 109.) The letter stated that she did not have the requisite experience to qualify for the position because she had "not reported being appointed a building inspector or a code compliance officer or have six years of management experience in the design, construction or supervision of the construction of buildings." (*Id.*; Def. Ex. CC.) On July 27, 2020, Ross again applied for the position of Code Compliance Supervisor. (*Id.* ¶ 110.) In January 2021, Jason Beeman, a White man, was appointed to the position. (*Id.* ¶¶ 64-65.)

Ross alleges that she did have the requisite experience as she had been a property manager for ten years before working with the City and had the first parts of her building code certification (Pl. 56.1 Resp. ¶ 108.) Plaintiffs allege Defendants discriminated against Ross by discounting her years of experience and hiring a White man instead.

### f. Maurice Williams

Williams started his employment with the City as a Parking Enforcement Officer in January 2005. (Def. 56.1 ¶ 112.) Throughout his employment, Williams was a member of the Civil Services Employees Association and therefore subject to the collective bargaining agreement ("CBA"). (*Id.* ¶ 2; 19.) In 2019, Williams applied for the Assistant Maintenance Mechanic position with the Water Department by submitting his application to Mike Rauchet, an officer of the union representing the City's municipal workers. (Williams Tr. 39:9-40:21, 41:20-24; Rauchet Aff. ¶ 1.) Williams understood that Rauchet took the application to Wayne Vradenburgh. (*Id.* 40:11-12.) Since October 2016, Vradenburgh has served the City as Superintendent of the Water Department. (Def. 56.1 ¶ 114.) Vradenburgh is not authorized to hire Assistant Maintenance Mechanics or any other City employees. (*Id.* ¶ 116.)

Williams was never interviewed for the position. (Williams Tr. 40:25-41:2.) Another African American man, Brandon Williams, also applied for the same position. (*Id.*) In early 2020, the City hired Ramon Sanchez, who Vradenburgh believes is Hispanic, and Daniel Dimitrov, who Vradenburgh

believes is Caucasian, as Assistant Maintenance Mechanics. (Def. 56.1 ¶¶ 118-19.) The parties dispute whether Vradenburgh ever received the application—Plaintiffs introduce evidence indicating that Vradenburgh did and Defendants introduce evidence that Vradenburgh did not. (*See* Vradenburgh Aff. ¶¶ 3-5; Rachet Aff. ¶ 2.)

Williams applied for the position of Sanitation Enforcement Officer. (Def. 56.1 ¶¶ 121-24.) Williams was offered and accepted the position effective September 2020. (*Id.*) Upon transferring from Parking Enforcement Officer to his new role as Sanitation Enforcement Officer, Williams' salary increased. (*Id.* ¶ 126.) He went from being paid in accordance with Grade 2, Step 6 of the applicable salary schedule set forth in the CBA to being paid in accordance with Grade 9, Step 3. (*Id.* ¶¶ 125, 127.) Williams states that he accepted Donat's offer to place him at Grade 9, Step 3, and that he received an increase in salary because of his promotion. (*Id* ¶ 132-33.) Plaintiffs allege that Donat indicated to Williams that he would authorize Williams' pay to be placed at Grade 9, Step 6. (Pl. 56.1 Resp. ¶¶ 128-129.) While Plaintiffs agree that Garrison was not authorized to set employee salaries, Plaintiffs argue that the reneging of the higher salary offer is further evidence of a pattern of discrimination by Defendants.

### g. *Maritza Wilson*

Maritza Wilson, a Hispanic woman, started as a clerk in the City's Recreation Department in 1984. (Def. 56.1 ¶ 143; Compl. ¶ 96.) Starting in 2007, Wilson started performing out-of-title duties by performing the duties and responsibilities of interim Recreation Director. (Wilson Tr. 25:4-7.) On or about December 4, 2020, the City posted a job posting for the position of Recreation Director, which included the minimum qualification that the applicant have either a bachelor's or associate's degree in Recreation, Physical Education, Education, or a related field and have one to two years full time paid experience or part-time/volunteer equivalent. (Def. 56.1 ¶ 135; Def Ex. DD.) On September 16, 2020, Wilson emailed Kelson and Donat stating that she was advised that she would not be able to apply for

the position of Recreation Director because she lacked a college degree but that she believed her years of experience was the equivalent of a degree. (Def. 56.1 ¶ 136.) The City ultimately appointed Sam Sutton, a man, to the position of Recreation Director in 2021. (Def. 56.1 ¶¶ 140-41.) While Sutton possessed the qualifications for the role, Wilson alleges he was an "utter failure" in performing his duties. (Def. 5.61 ¶ 143; Pl. 56.1 Resp. ¶ 142.)

Although disputed by Defendants, Wilson alleges that Donat said that the City council wanted a younger male for the position. (Wilson Aff. ¶ 3.) Moreover, Wilson alleges that she was told that the job qualifications would be changed "to account for her experience and excellence in the position." (Pl 56.1 Resp. ¶ 139.) Wilson claims that she had repeatedly and successfully performed the duties of director, demonstrating that the education requirement was not pertinent to the job duties. (*Id.* ¶ 137.) Therefore, Plaintiffs argue that Defendants discriminated against Wilson by hiring a man for the position instead.

## LEGAL STANDARD

### I.  Motion for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, including depositions, documents, affidavits, or declarations "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To oppose summary judgment, "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435,

452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (holding the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation") (internal quotations and citations omitted).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013). Courts must "draw all rational inferences in the non-movant's favor" when reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not [ ] to weigh the evidence and determine the truth of the matter" or determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. A court should grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## II. Employment Discrimination Claims unders Section 1983

The Fourteenth Amendment affords employees the right to be "free from discrimination  . . ." and therefore, employees may vindicate that right under "[Section] 1983 against any responsible persons acting under color of state law." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)). To properly assert a claim under Section 1983, a plaintiff must allege: (1) a violation of a right secured by the Constitution and laws of the United States and (2) the alleged deprivation was committed by a person acting under color of state law." *Id.* at 87-88 (internal citations and quotations omitted). Additionally, "[i]n this Circuit personal

involvement of defendants in the alleged deprivations is a prerequisite to an award of damages under §
1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977); *Fiengold v. New York*, 366 F.3d 138,
159 (2d Cir. 2004).

Employment discrimination claims brought under Section 1983, alleging employment
discrimination based on race, religion, sex or national origin, are governed by the analysis established
in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Back v. Hastings on Hudson Union
Free School Dist.*, 365 F.2d 107, 122 (2d Cir. 2004). To establish a *prima facie* employment
discrimination claim, a plaintiff must demonstrate that (1) she belonged to a protected class; (2) she was
qualified for the position she held; (3) she suffered an adverse employment action; and (4) that the
adverse employment action occurred under circumstances giving rise to an inference of discriminatory
intent. *Tolbert v. Smith*, 790 F.3d 427, 436 (2015); *Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir.
1991). Once an employee has demonstrated a prima facie case, "[t]he burden then shifts to the employer
to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting
*McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817). "If the employer articulates such a reason
for its actions, the burden shifts back to the plaintiff to prove that the employer's reason was in fact
pretext for discrimination." *Id.* (internal quotation marks omitted).

Here, the parties primarily place at issue the fourth prong of the *McDonnell Douglas* test, where
Plaintiffs must raise an inference of discriminatory intent, and the respective burdens of Plaintiffs and
Defendants once Plaintiffs have established a *prima facie* discrimination case.

On a motion for summary judgment, in determining whether a plaintiff has satisfied the fourth
prong of her *prima facie* case, the court determines whether the "proffered permissible evidence shows
circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory
motive." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994). In meeting this burden,
plaintiff will seldom be able to prove discrimination by direct evidence, and therefore may rely on

circumstantial evidence. *Id.* "A permissible inference of discriminatory intent may be drawn from the more favorable treatment of employees not in the protected group." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 494. 513 (S.D.N.Y. 2010) (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). However, a plaintiff raising an inference of discrimination based on disparate treatment must show that the comparator is "similarly situated . . . in all material respects." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (quoting *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.*

When the burden shifts to the defendant, the burden to present a legitimate, non-discriminatory reason is "one of production, not persuasion; it can involve no credibility assessment." *Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 278 (S.D.N.Y. 2008) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Finally, "a [Section] 1983 plaintiff's burden at the third stage of the *McDonnell* Douglas analysis is not simply to establish that discrimination played *some* role in her termination, but that it played a decisive role." *Naumovski v. Norris*, 934 F.3d 200, 217 (2d Cir. 2019) (emphasis in original). Therefore, to establish pretext in an equal protection claim pursuant to Section 1983, a plaintiff must establish that "the employer's stated reason would not, alone, constitute a sufficient basis for pursuing an adverse action," or put another way, that the "employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Id.* at 214-15.

### DISCUSSION

Plaintiffs allege that "[w]hen viewed in its totality . . . a reasonable jury could find a pattern of disparate treatment, favoring Caucasian and male employees over the African American, Hispanic, and female [P]laintiffs." (Pl. Opp. at 5.) Defendants argue summary judgment is appropriate because there

is no dispute of material fact and Plaintiffs have failed to establish that Defendants intentionally discriminated against them.

For the reasons discussed in more detail below, Plaintiffs largely fail to raise an inference of discrimination based on race or national origin through direct or indirect evidence. Based on the evidence in the record, the jury could not reasonably infer that Defendants' actions against Plaintiffs was motivated by discriminatory animus or even ill will, except for one Plaintiff's claim.

### A. Patricia Bunten

Bunten alleges Defendants discriminated against her in violation of her equal protection rights under the Fourteenth Amendment by denying her request to work from home during the COVD-19 pandemic despite similarly situated, non-Hispanic employees being permitted to do so. (Pl. Opp. at 8-10.) Defendants argue that Plaintiffs have failed to establish Bunten's request to work remotely was denied because she is Hispanic. (Def. Mem. at 3.) According to Defendants, all "essential" City employees, regardless of their national origin, were prohibited from working remotely. (*Id.*)

Defendants have articulated, and the record supports, a non-discriminatory reason for denying Bunten's request to work from home. Only a few days after Bunten made her request to work remotely, the Department was deemed "essential" by HRA Merritt on April 17, 2020. (Def. Ex. N.) Moreover, the Water Department administrative personnel and Planning and Development Department was designated as "non-essential." (Def. Ex. L.) Moreover, Chief Horton stated that he did not feel that Bunten, as well as all the other individuals in the Department, "could be effective working from home." (Def. Ex. M at 318; *see also* Horton Tr. 149:11-150:2 (stating it was his "suggestion" they "should all be in the office").) Accordingly, the Court need only determine whether Plaintiffs have sufficiently raised an inference of discrimination. The Court finds they have not.

Plaintiffs challenge Defendants' contention as flawed because the decisionmakers failed to consult with the Department's staff to determine whether Bunten could work virtually when they

designated the Department as "essential." (Pl. Opp. at 9.) Plaintiffs further argue that there are factual issues as to whether Bunten's work was appropriately deemed "essential." (*Id.* at 9-10; Bunten Aff. ¶¶ 2-3; *see also* Ross Aff. ¶¶ 9-10.) Specifically, Plaintiffs point to the reduced workload of the Department during the pandemic, the little "walk-in business," and its ability to re-adjust functions. (*Id.*) As for raising an inference of discriminatory animus, Plaintiffs argue that the Department, deemed "essential," was "overwhelmingly minority," while the Planning Department, deemed "non-essential," was "predominantly white." (Pl. Opp. at 10.) As further proof, Bunten points to the White administrative assistant to Superintendent of the Water Department and three White individuals from the Planning and Development Department—Erin Cousins, Elka Gotfryd, and Alexandra Church—who were permitted to work from home. (Bunten Aff. ¶ 4; Bunten Tr. 61:10-65:2.)

Plaintiffs' argument hinges on the contention that the decision to deem one department essential but not another lacked a rational basis. However, this is insufficient to raise an inference of intentional discrimination. Defendants have articulated that the job duties of the Department could not be performed from home, and the Court accepts that representation. *See Lambert* at 278 (Defendants' burden to present a legitimate, non-discriminatory reason" is "one of production, not persuasion; it can involve no credibility assessment.") (citation omitted). Moreover, Chief Norton explained his non-discriminatory rational for his belief that the Department could not be effective working from home—Plaintiff worked in a "front facing, paper driven position that requires people to be at their workstations." (Def. Ex. M at 318.)

As Defendants have provided a non-discriminatory reason for designating the Department essential, it is Plaintiffs' burden to demonstrate Defendants' stated reason is pretextual. Plaintiff advances no evidence or arguments to satisfy this burden. Undisputedly, the two departments did work in the same floor in the same building. However, Plaintiff does not demonstrate in the record or otherwise that the Planning Department performed substantially similar functions so that the Court could infer a

discriminatory motive in the decision to designate it as "non-essential." Plaintiffs argue a discriminatory inference is raised when considering "the nature of functions both performed," however, there is no evidence in the record for the Court to make that assessment. Without more, Plaintiffs' firmly held belief that her duties could be performed remotely is insufficient to rebut this non-discriminatory reason.

Other than her assertions that her job functions could be performed from home, the only factual allegation supporting Bunten's argument is that employees in the Department, including herself, who were considered essential and denied the ability to work from home are primarily non-White. Again, pointing to the different racial compositions of the two departments does not suffice—Plaintiffs must adduce evidence that the decision regarding remote work was *because of* the Department employees' race or national origin. Moreover, Plaintiffs fail to address the evidence that two White employees in the Department also did not work remotely. (Donat Aff. ¶ 12.) Accordingly, Plaintiffs fail to rebut Defendants' proffered non-discriminatory reason and raise a reasonable inference that the Department was designated as "essential" *because of* its employees' race or ethnicity. The record otherwise lacks any evidence that Buntan's identity as a Hispanic individual influenced the decision to deny her the ability to work remotely. Accordingly, the Court dismisses Bunten's discrimination claim.

### B. Reginald Brown

Reginald Brown argues Defendants violated his equal protection rights under the Fourteenth Amendment when they denied his request for promotion to Code Compliance Supervisor. Specifically, Plaintiffs argues a reasonable juror could conclude that the decision not to promote Brown was motivated by his race because a less qualified, White man was appointed instead. (Pl. Opp. at 11-12.) Defendants argue that Brown was not promoted because he was not qualified for the position, and even if he was qualified, the person ultimately appointed to the position "was qualified and determined to be the best candidate for the position." (Def. Mem. at 11-12.) The parties do not dispute the qualifications for the

Code Compliance Supervisor position. However, they do dispute that either Brown or Beeman, the White individual ultimately appointed to the position, was qualified.

To establish a *prima facie* case, a plaintiff must show "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *United States v. City of New York*, 717 F.3d 72, 84 (2d Cir. 2013) (citing *McDonnell Douglas*, 411 U.S. at 802)).

To qualify for the Code Compliance Supervisor position, an applicant has to have either (1) a bachelor's or associate's Degree in engineering, architecture, fire protection, construction management or closely related field; or (2) at least four years of experience as a building inspector or code enforcement officer or at least six years of management experience in the design, construction or supervision of the construction of buildings. (*See* Def. Ex. R.) The record is clear that at the time of his application in July 2020, Brown lacked the requisite qualifications because he had an associate's degree and only three years of experience as a code enforcement officer and no management experience. (Def. Ex. S.) As Plaintiffs point out, Chief Horton states that Brown "met the initial requirements for the job," (Horton Tr. 167:20-23.) Brown's resume belie that assertion. (*see* Def. Ex. R.) That Brown lacked the minimum qualifications is further supported in the record by HRA Merritt's email which stated that "only one internal applicant [] meets the minimum qualifications." (*See* Def. Ex. T.) Accordingly, Brown failed to establish a *prima facie* case for employment discrimination because he failed to meet the minimum qualifications for the Code Compliance Supervisor position when he applied in July 2020.

The Court notes that in January 2021, Brown would have just reached four years of experience as a code enforcement officer, and still had his associate's degree. (Pl. Opp. at 11; Def. Ex. S.) Therefore, at the time Beeman was promoted, Brown was qualified for the job. However, the record establishes that Beeman also met the minimum qualifications. Beeman's resume indicates he had a high school diploma

and three years' experience as a Project Manager and Estimator on seven to eleven sites. (Def. Ex. T.) While he does not refer to construction directly, it is clear this job was related to the construction of buildings as he states that part of his duties was to "schedul[e] contractors" and "procu[re] building materials." (*Id.*) On top of this explicit managerial experience, Beeman worked for three years as a foreman—generally understood as the supervisor/manager of workers on a job site—on construction projects. Despite Plaintiffs' assertion to the contrary, Beeman had at least six years' experience in the construction or supervision of the construction of buildings and therefore was qualified for the position.

For a disparity in qualifications to raise an inference of discrimination, "the disparity should be enough that a reasonable employer would have found the plaintiff to be significantly better qualified for the job." *United States v. City of New York*, 713 F. Supp. 2d 300, 320 (S.D.N.Y. 2010) (citations omitted). Despite Beeman and Brown both being qualified at the time of Beeman's hiring, the record does not indicate that Brown was so much more qualified or that the decision to promote Beeman otherwise raises an inference of discriminatory intent. Despite being an internal candidate and his experience working for the City, Brown would have just met the minimum qualifications in contrast to Beeman's several years of managerial experience. Moreover, Donat stated that "Beeman's extensive experience in construction would be a great asset to the Code Compliance Department because the knowledge learned from that experience is important for the work of that department." (Donat Aff. ¶ 18.) The Court finds this rationale rational, legitimate, clear, and non-discriminatory. Again, Plaintiffs fail to rebut Defendants' stated non-discriminatory reason and therefore Brown's discrimination claim fails.

As stated above and will be repeated throughout, the mere fact that a minority individual was treated differently or less favorably than a non-minority individual is insufficient to state a discrimination claim. Plaintiffs must show that the Defendants' discriminatory intent was the *but for* cause of the adverse employment action. Beyond the fact that Defendants decided to appoint a White individual over a Black, Hispanic individual, Plaintiffs are unable to point to any evidence in the record to show that

Brown's race was the *but for* cause of the decision to not to hire him.[3] *Velez v. McHugh*, No. 09 CIV. 0925 GAY, 2011 WL 778693, at *4 (S.D.N.Y. Mar. 2, 2011) (finding that the selection of another candidate, possibly with fewer years' experience but possessing the relevant skills," was not "unreasonable or a pretext for discrimination.").

### C. Tamie Hollins

Plaintiffs argue Defendants discriminated against Tamie Hollins by subjecting her to disparate treatment and to inferior terms and conditions of employment. Specifically, Plaintiffs assert that Defendants discriminated against Hollins by (1) failing to compensate her for performing out-of-title duties; (2) subjecting her to extreme temperatures in her office and mold on her office wall; and (3) providing newer vehicles and PPE equipment to White employees over non-White employees. Plaintiffs have failed to state a *prima facie* claim for discrimination.

Hollins argues that herself, Plaintiff Ross, and Plaintiff Wilson, who are all Black women, performed out of title work for years without compensation. (Pl. Opp. at 14-15.) Defendants "taking advantage" of the work of these African American women, Plaintiff argues, permits a reasonable jury to conclude that this treatment was part of a pattern of racial discrimination. (*Id.*) However, Plaintiffs fail to identify similarly situated non-Black individuals who *did* receive compensation for their work. Plaintiffs may have properly raised this inference if they had presented some evidence of non-Black or

---

[3] Although not raised in the parties' motion papers, Plaintiffs' counterstatement contains facts that Horton called Brown "lazy," which Brown understood as a race-based remark. (Pl. 56.1 Counter ¶ 35; Brown Tr. 33:18-24.) However, Brown indicates this comment was made in September 2020, months after Brown had applied for the position for which he did not meet the minimum qualifications. (Brown Aff. ¶ 2.) Otherwise, Brown indicates that Horton did not make any other racial remarks towards him. (Brown Tr. 34:16-20.) While the Court certainly recognizes that the comment "lazy" with regards to a Black individual may be racially charged or discriminatory, the record also indicates Horton explicitly expressed dissatisfaction with Brown's work ethic in a manner seemingly unrelated to his race. (Pl. 56.1 Counter ¶ 50 (Horton indicated Brown's "productivity and some issues gave [him] pause to promote him"); Brown Tr. 33:25-34:9 (Horton told Brown that all Brown does is "sit in [his] office and "[r]ide around with other code officers while they do the work.").) Brown's belief that he was being discriminated against, without more, is insufficient. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999) ("[Plaintiff's] feelings and perceptions of being discrimination against are no evidence of discrimination.") (citation omitted).

even White employees completing out of title duties and being properly compensated for their work. Plaintiffs' conjecture without supporting evidence is insufficient to state a *prima facie* claim.

Regarding their allegations related to the extreme temperatures and mold conditions Hollins experienced in her employment, Plaintiffs fail to present any evidence that this was due to Hollins' gender or race. In fact, the record indicates that Hollins was provided *the same*, and not differential, treatment as employees outside of her protected class—the evidence shows that all similarly situated employees were subjected to the same conditions. The Planning and Development Department, which Plaintiffs describe as primarily White, is in the same building and on the same floor as the Department. Plaintiffs do not deny that the entire building has these issues. Defendants have stated that all employees who work in that building experience the extreme temperatures during the winter and summer. In response, Plaintiffs argue that Defendants "failed to identify a single White employee who was subject to the panoply of deprivations" that Hollins experienced. (Pl. Opp. at 13.) However, the burden lies with Plaintiffs to raise a reasonable inference of discriminatory intent. Plaintiffs have failed to do so.

The same is true for Hollins' conclusory assertion that the Department always received sub-par vehicles while other departments received newer vehicles. (Hollins Aff. ¶ 7.) As Plaintiffs admit, employees assigned to multiple departments, consisting of a variety and racial and ethnic backgrounds, have received municipal vehicles requiring maintenance. (Donat ¶ 29; Pl. 56.1 Resp. ¶ 90.) Finally, Hollins allegations that Chief Horton primarily distributed the PPE equipment to the primarily White fire department over the primarily non-White Code Compliance Department also fall short. Plaintiffs have not established that Hollins is similarly situated as any of the individuals in these other departments, and certainly could not establish that she received sub-par vehicles and Horton did not provide her with PPE *because of* her race. Hollins' assertion that these actions were motivated by racial discrimination is conclusory and speculative, and devoid of details that could give rise to an inference of discriminatory intent.

### D. Lisa Ross

In 2019 and 2022, Ross filed applications for the position of Code Compliance Supervisor. Like Williams, Ross alleges that she was discriminated against when Defendants hired Beeman over her for the position of Code Compliance Supervisor. As with Williams' claim, Plaintiffs have failed to raise an inference of discriminatory intent.

Even construing the record in the light most favorable to Plaintiffs, Ross' ten years of experience as a property manager did not qualify her for the position. (Ross Tr. 73:4-12; Def. Ex. AA, BB.) While Ross had ten years of managerial experience, she did not have that experience in the design, construction, or supervision of the construction of buildings. Ross worked as a typist and administrative assistant for the City, as well as other "out of title" duties (Pl. 56.1 Resp. ¶ 103.) However, Ross frames her experience in her July 2020 application for the position as administrative by stating she "oversee[s] positions of an assistant to property manager, porter, super, and a maintenance technician." (Def. Ex. B.) Even more, Plaintiffs themselves characterize Ross' out of title duties as "managing the front end of office," "keeping records," and "enforcing code officers' calendars." (Pl. 56.1 Counter ¶ 91.) Accordingly, Ross was not qualified for the position, therefore Beeman's appointment to the position over her does not give rise to an inference of discriminatory intent.

Even if Ross did qualify, Plaintiffs otherwise fail to allege facts sufficient to reasonably infer that Defendants' decision was motivated by discriminatory animus. Plaintiffs fail to link Ross' race, gender, or national origin to her rejection from the position. Notably, neither Plaintiffs nor Defendants discuss Ross' race or ethnicity in their papers.[4] In fact, Plaintiffs do not mention Ross' gender, race, or national origin at all throughout their Rule 56.1 Statement and Counterstatement, their Opposition, or even Ross' affidavit.

---

[4] It is stated in the Complaint that Ross is an African American woman. (Compl. ¶ 52.)

Finally, as discussed above, the Court disagrees with Plaintiffs' assertion that Beeman lacked any "managerial" experience. A foreman is a supervisory position, generally understood as overseeing or managing workers on a jobsite. Moreover, Beeman explicitly held the title of "Project *Manager*," and the description supports that he managed operations in some capacity. (*Id.* (indicating that Beeman has "7-11 sites running at one time" and works with "5-10 contractors").). Again, the mere fact that a White man was appointed to a position over a non-white, female is insufficient to state a claim for employment discrimination.

### E.  Maurice Williams

Williams argues that Defendants discriminated against him when they failed to transfer him to Assistant Maintenance Mechanic and failed to provide him with a higher placement on the salary schedule after he was promoted to Sanitation Enforcement Officer. Defendants argue summary judgment is appropriate because Williams did not suffer an adverse employment action because he (1) did receive a higher salary and (2) never applied for the position. (Def. Mem. at 30.)  The two individuals selected for the position were not Black. (Pl. 56.1 Counter ¶ 102.) While the City did not hire two White individuals to fill the positions, it did hire two non-Black individuals. (Vradenburgh Aff. ¶¶ 8-11.)

While Plaintiff may have raised a dispute of fact regarding whether Williams applied to the position,[5] the dispute is irrelevant because Plaintiff has failed to establish a *prima facie* claim of discrimination. The facts in the record are insufficient to support that Williams' rejection for the position occurred under circumstances giving rise to an inference of discriminatory intent. Significantly, Plaintiffs have failed to present evidence that Williams and the other Black applicant was similarly situated to the White and Hispanic individuals ultimately hired. There are no facts in the record regarding

---

[5] Plaintiff raises a dispute of fact. Defendants assert that Williams never submitted his application as their non-discriminatory reason for not hiring him. Rauchet, the union representative to whom Williams gave his application, asserts he provided Williams' application to Vradenburgh, the Water Department head, who claims he never received it. (Rauchet Aff. ¶ 2; Vradenburgh Aff. ¶¶ 3-4.). However, there is no evidence in the record that, even if Vradenburgh did refuse to hire Williams, tie this refusal to Williams' race.

the qualifications of the two Black applicants who were not hired and the two non-Black applicants who were hired. Again, the only support for their claim of discrimination is the fact that Defendants chose to hire two non-Black individuals over the Black individuals. The records does not even indicate how many individuals applied for the position or that other Black applicants also applied but were passed over in favor of the White and Hispanic applicants. Accordingly, the Court may not reasonably infer a discriminatory motive in Defendants' decision regarding the Assistant Maintenance Mechanic position.

Williams' claim regarding his salary increase is also deficient. The record indicates that Donat, not Garrison, authorized Williams to be placed on Grade 9, Step 3 of the salary schedule set forth to the CBA based on recommendations from City staff. (Donat Aff. ¶¶ 34-37.) Nor do Plaintiffs dispute that Garrison was not authorized to offer or establish the salary for employees governed by the CBA. (*Id.* ¶ 39.) In fact, Plaintiffs do not even challenge Grade 9, Step 3 as the appropriate salary for Williams in the position. Rather, Williams' discrimination claim rests entirely on his testimony that Garrison attempted to place him on Grade 9, Step 6 of the salary schedule. Defendants provided a non-discriminatory reason for denying Williams the higher salary, and Plaintiffs again offer no other evidence that indicates this stated reason was pretextual or otherwise motivated by discrimination.

### F. Maritza Wilson

Wilson, a Hispanic woman, alleges she was discriminated against when she was denied a promotion to the position of Recreation Director and a man was appointed instead. Defendants argue that she cannot establish a discrimination claim because she was not qualified for the position. (Def. Mem. at 33.) At the relevant time, the minimum qualifications for the Recreation Director position included a bachelor's or associate's degree. (Def. Ex. DD.)  However, Wilson believed that despite her lack of a college degree, she was qualified for the position given her years of experience performing the Director's duties and responsibilities. (Def. Ex. EE at 337.) Moreover, Wilson states that she had been promised the Director position by Donat. (Wilson Tr. 50:10-14.)

Wilson's discrimination claim largely rests on the failure of the City to alter its qualifications for the Recreation Department so that she could qualify despite her not possessing a bachelor's or associate's degree. (*See* Wilson Aff. ¶ 2.) In support, she points to promises by Donat and Kelson that the qualifications would be changed "to account for [her] experience and excellence in the position." (*Id.*) At the outset, as the qualifications for the position were not changed, Wilson simply did not meet the minimum qualifications for the position of Recreation Director. However, Plaintiffs put forth evidence, which Defendants do not address, that Wilson had routinely performed in the Director role for years. (Wilson Tr. 27:8-28:21.) Given that Wilson had successfully performed the duties of Director for years and had been promised that the qualifications would be changed so that she could apply—which neither the record nor Defendants contradict—a man being appointed to the position over Wilson raises an inference of discrimination sufficient to establish a *prima facie* claim.

In response to Plaintiffs' *prima facie* case, Defendants provide the non-discriminatory reason that Donat did not appoint Wilson because he wanted to appoint someone with a college degree. (Def. Mem. at 34.) This satisfies Defendants' burden, therefore the burden shifts back to Plaintiffs. Beyond promises made to Wilson that she would be promoted to the position, the record also indicates Donat made a statement that the City's council "wanted a younger male for the job." (Wilson Aff. ¶ 3.) In determining whether a remark is probative of employment discrimination, courts consider "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Summit v. Equinox Holdings, Inc.*, No. 20 CIV. 4905 (PAE), 2022 WL 2872273, at *13 (S.D.N.Y. July 21, 2022) (citing *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)).

As a threshold matter, Defendants do not concede that Donat made this statement. This raises a material dispute of fact. Additionally, Wilson indicates this comment was made in August 2020 during a discussion about filling the Recreation Director role in the context of preparing for a budget hearing. (Wilson Tr. 73:2-74:12.) Furthermore, in the email from Wilson on September 16 and nearly a month after Donat's alleged comment, Wilson indicated that the "Director position will be posted." (Def. Ex. EE.) The record is unclear as to when the Director position was posted. However, it was certainly before Sutton's hiring in 2021 given Wilson's email and the deadline for applying to the position being listed as December 21, 2020. (Def. Exs. DD, EE.) Considering Wilson's demonstrated ability to perform the duties as Director, that she was repeatedly promised the promotion, and Donat's alleged statement that the City wanted to fill the position with a man, the Court finds that a reasonable factfinder could infer that Donat did not appoint Wilson to the position of Director due to her gender. Accordingly, the Court denies Defendants' motion for summary judgment with respect to Wilson's claim.

Finally, Defendants argue this claim should be dismissed against Donat because Donat did not have the requisite personal involvement and he is entitled to qualified immunity. (Def. Mem. at 34-35.) Defendants only briefly address this argument, arguing that "[b]ased upon the information presented to Mr. Donat and his staff, it was objectively reasonable for him to believe that, in his capacity as City Manager, he could appoint Mr. Sutton, who qualified for the position sought, without violating Ms. Wilson's constitutional rights." (Def. Mem. 33-34.)

In determining whether defendants are entitled to qualified immunity, courts consider "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citation omitted).

Here, at the time of the alleged discrimination, it was clearly established that Wilson had a right to be free from gender discrimination. If Donat refused to appoint Wilson to the position of Recreation Director solely because she is a woman, then it would have been clear to Donat that such decision violated her constitutional rights.  Accordingly, Wilson's claim against Donat survives. *Back*, 365 F.3d at 130 (2d Cir. 2004) (finding defendants not subject to qualified immunity where jury could find that defendants discriminated against plaintiff because she was a woman with young children).

### G.  Pattern of Discrimination

"Even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Doner-Hedrick v. New York Inst. of Tech.*, 874 F. Supp. 2d 227, 239 (S.D.N.Y. 2012). Plaintiffs' claims, except for Wilson's, are largely devoid of the detail necessary to either raise a reasonable inference that Defendants had a discriminatory motive or show that Defendants' actions were caused by discriminatory intent. Specifically, Plaintiffs repeatedly assert that certain departments are "primarily" or "overwhelmingly" White or non-White, without providing actual details on the number of individuals in the department, specifying the number of white and non-White individuals in that department, or otherwise presenting any other evidence for the Court to reasonably infer that the differential treatment was motivated in part by the race, ethnicity, or gender of the individuals in those departments. Furthermore, Plaintiffs speculate that the allegedly less favorable treatment was due to Plaintiffs' protected characteristics without any evidence that the comparative individuals are similarly situated. Plaintiffs also fail to present statistical evidence or otherwise establish a pattern of Defendants refusing to hire non-White applicants. Instead, Plaintiffs proffer anecdotal evidence of hiring decisions that fail to even support their claims that Defendants discriminated against non-White applicants: in one instance, the non-White applicants were not qualified for the positions and in the other, Defendants actually hired an external, non-White applicant.

For most of their claims, Plaintiffs rely on "the recitation of a false syllogism: (1) I am (insert name of protected class); (2) something bad happened to me at work; (3) therefore, it happened because I am (insert name of protected class)." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 581 (S.D.N.Y. 2011). Even taken together and construed in the light most favorable to Plaintiffs, the evidence in the record falls well short of supporting a reasonable inference of employment discrimination. Plaintiffs argue these handful of instances where a White employee or primarily White department appears to have been given preferential treatment indicate "a municipal intent to discriminate on prohibited grounds." (Pl. Op. at 23.) However, these arguments rest largely on Plaintiffs' conjecture and speculation. Plaintiffs have "done little more than to cite to [their] alleged mistreatment and ask the court to conclude that it must have been related to [their] race [or national origin.]" *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002). Accordingly, the Court dismisses Plaintiffs' equal protection claims *except for* Wilson's gender discrimination claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The Court of the Clerk is directed to enter judgment in favor of Defendants as to the First through Fifth Causes of Action for employment discrimination in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983. Accordingly, Plaintiffs Bunten, Brown, Hollins, Ross, and Williams are no longer part of the action. The sole remaining cause of action is the Sixth Cause of Action, Plaintiff Wilson's claim for employment discrimination in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983. The Clerk of Court is further respectfully directed to terminate the motion at ECF No. 46.

The Parties are directed to appear for a telephonic pre-trial conference on May 31, 2024 at 11:00 a.m. To access the telephonic pre-trial conference, please follow these instructions: (1) Dial the meeting

number: (877) 336-1839; (2) enter the Access Code: 1231334#; (3) press pound (#) to enter the conference as a guest.

Dated: April 16, 2024                            SO ORDERED:
      White Plains, New York

_____

NELSON S. ROMÁN
United States District Judge